# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 1:14-CV-22205-WPD

CITY OF MIAMI, a Florida municipal
Corporation,

                                                       DEMAND FOR JURY TRIAL

       Plaintiff,

v.

JPMORGAN CHASE & CO.,
JPMORGAN CHASE BANK, N.A.,
JPMORGAN CHASE and CHASE
MANHATTAN BANK USA, N.A.,

       Defendants.

_____/

# FIRST AMENDED COMPLAINT
# FOR VIOLATIONS OF THE FEDERAL FAIR HOUSING ACT

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION ........................................................................1

    A.    JPMorgan Has Engaged in a Continuing Pattern of Discriminatory
        Mortgage Lending Practices in Miami Resulting in Foreclosures.........................1

II.   PARTIES ..............................................................................................9

III.  JURISDICTION AND VENUE ..................................................................13

IV.   FACTUAL BACKGROUND .....................................................................13

    A.    Background Regarding Discriminatory Loan Practices, Reverse Redlining,
        and Redlining. ...............................................................................13

V.    JPMORGAN ENGAGED IN DISCRIMINATORY LENDING PRACTICES. .............16

    A.    JPMorgan's Conduct Had a Disparate Impact on Minority Borrowers in
        Violation of the Fair Housing Act. ....................................................16

        1.    Discriminatory lending results in a disproportionate number of
            foreclosures in minority areas....................................................16

        2.    Minority neighborhoods are disproportionate recipients of
            predatory loans.....................................................................18

    B.    JPMorgan Intentionally Discriminated Against Minority Borrowers in
        Violation of the Fair Housing Act, as Demonstrated by Former Bank
        Employees.    ...............................................................................21

        1.    JPMorgan targets minorities for predatory loan terms (and pays its
            employees more for doing so)....................................................21

        2.    JPMorgan has underwritten short-term teaser rate loans, stated-
            income loans, interest only loans, and HELOCs that borrowers
            could not afford....................................................................22

        3.    JPMorgan induced foreclosures by failing to offer refinancing or
            loan modifications to minority customers on fair terms, and
            otherwise limiting equal access to fair credit...............................25

        4.    JPMorgan engages in other abusive lending practices. ...........................25

    C.    Minorities in Miami Receive Predatory Loan Terms from JPMorgan
        Regardless of Creditworthiness. ........................................................26

    D.    Miami's Data Analysis is Corroborated by Additional Studies/Reports. .............30

i

E.      JPMorgan's Targeting of Minorities who in Fact Receive Predatory Loan Terms Regardless of Creditworthiness Causes Foreclosures. .............................30

     1.     Data shows that JPMorgan's foreclosures are disproportionately located in minority neighborhoods in Miami.............................................30

     2.     Data shows that JPMorgan's loans to minorities result in especially quick foreclosures in Miami. ....................................................33

     3.     Data shows that the discriminatory loan terms cause the foreclosures in Miami. ..................................................................34

VI.      INJURY TO MIAMI CAUSED BY JPMORGAN'S DISCRIMINATORY LOAN PRACTICES ........................................................................35

     A.     Non-Economic Injuries ..........................................................36

     B.     Economic Injuries ...............................................................36

     1.     Miami has been injured by a reduction in property tax revenues from foreclosures caused by discriminatory loans issued by JPMorgan ...................................................................36

     C.     Miami Is Injured Because It Has Provided and Still Must Provide Costly Municipal Services for Foreclosure Properties in Minority Neighborhoods as a Direct Result of Discriminatory Loans Originated or Purchased by JPMorgan. ....................................................................39

VII.     SAMPLE PROPERTIES IN THE CITY OF MIAMI. ........................................41

     A.     Foreclosures ....................................................................41

     B.     Predatory Loans Issued Subsequent to June 13, 2012. ........................41

VIII.    STATUTE OF LIMITATIONS AND CONTINUING VIOLATIONS DOCTRINE. .................................................................42

IX.      CLAIMS FOR RELIEF ........................................................42

FIRST CLAIM FOR RELIEF .........................................................42

SECOND CLAIM FOR RELIEF .......................................................44

DEMAND FOR JURY TRIAL ........................................................45

PRAYER FOR RELIEF ..............................................................46

## I.      NATURE OF THE ACTION

1.      It is axiomatic that banks should not make discriminatory loans. Banks must extend credit to minorities on equal terms as they do to other similarly situated borrowers. Banks should not target minority neighborhoods for loans that discriminate nor make loans to minorities on terms that are worse than those offered to whites with similar credit characteristics. When Banks engage in such discriminatory conduct, it has profound non-economic and economic consequences for the cities in which mortgaged properties exist, and Banks should be responsible for those consequences. JPMorgan's conduct has harmed the residents of Miami and impaired the City's strong, longstanding and active commitment to open, integrated residential housing patterns and its attendant benefits of creating a stable community that increases professional opportunities and the quality of life in the City. Additionally, JPMorgan's conduct has caused the City to lose property tax revenues and required the City to pay the costs of repairing and maintaining properties that go into foreclosure due to discriminatory lending. This lawsuit arises because JPMorgan breached these legally mandated obligations and foreseeably injured the City of Miami.

### A.      JPMorgan Has Engaged in a Continuing Pattern of Discriminatory Mortgage Lending Practices in Miami Resulting in Foreclosures.

2.      This suit is brought pursuant to the Fair Housing Act of 1968 ("FHA"), as amended, 42 U.S.C. §§ 3601, *et seq.*, by the City of Miami ("Miami" or "City") to seek redress for injuries caused by JPMorgan's[1] ("JPMorgan" or "the Bank") pattern or practice of illegal and discriminatory mortgage lending. Specifically, Miami seeks injunctive relief and damages for the injuries caused by foreclosures on JPMorgan's loans in minority neighborhoods and to minority borrowers that are the result of JPMorgan's unlawful and discriminatory lending practices. The

---

[1] Defendants collectively are referred to as "JPMorgan," including: JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., JPMorgan Chase, and Chase Manhattan Bank USA, N.A. JPMorgan Chase & Co. is the result of the combination of several large U.S. banking companies over the last decade including JPMorgan Manhattan Bank, J.P. Morgan & Co., Bank One, Bear Stearns and Washington Mutual. Accordingly, Plaintiff alleges that Defendants are also liable for residential home loans and lending operations acquired from, and/or sold by or through, Washington Mutual Bank, Washington Mutual Bank F.A., Bear Stearns Residential Mortgage, Chase Manhattan Mortgage Corporation, Encore Credit Corporation, Long Beach Mortgage Company, Performance Credit Corporation, JPE Home Finance LLC, and Bravo Credit Corp.

unlawful conduct alleged herein consists of both intentional discrimination and disparate impact discrimination.

3.      The State of Florida in general, and the City of Miami in particular, have been devastated by the foreclosure crisis. As of October 2013, Florida has the country's highest foreclosure rate, and Miami has the highest foreclosure rate among the 20 largest metropolitan statistical areas in the country.[2] Moreover, Florida is by far the leading state in the country with regard to owner-vacated or "Zombie" foreclosures.[3] Since 2008, banks have foreclosed on approximately 1.8 million homes in Florida, and JPMorgan is responsible for a significant number of these foreclosures.

4.      The foreclosure crisis in Florida resulted in such drastic consequences that the Florida Supreme Court established a Task Force to recommend "policies, procedures, strategies, and methods for easing the backlog of pending residential mortgage foreclosure cases while protecting the rights of parties."[4]

5.      JPMorgan has engaged in a continuous pattern and practice of mortgage discrimination in Miami since at least 2004 by imposing different terms or conditions on a discriminatory and legally prohibited basis. In order to maximize profits at the expense of the City of Miami and minority borrowers, JPMorgan adapted its unlawful discrimination to changing market conditions. This unlawful pattern and practice is continuing through the present and has not terminated. Therefore, the operative statute of limitations governing actions brought pursuant to the Federal Fair Housing Act has not commenced to run.

---

[2] RealtyTrac, *Scheduled Judicial Foreclosure Auctions Increase Annually for 16th Straight Month, Foreclosure Starts Up Monthly for Second Straight Month, Big Jumps in FL, IL, CO*, (Nov. 14, 2013), *available at* http://www.realtytrac.com/content/foreclosure-market-report/october-2013-us-foreclosure-market-report-7934.

[3] RealtyTrac, *Q1 2013 Foreclosure Inventory Update*, at 5, *available at* http://www.realtytrac.com/images/reportimages/RealtyTrac_Foreclosure_Inventory_Analysis_Q1_2013.pdf.

[4] Florida Supreme Court Task Force On Residential Mortgage Foreclosure Cases, *Final Report And Recommendations* (Aug. 17, 2009), *available at* www.floridasupremecourt.org/.../Filed_08-17-2009_Foreclosure_Final_.

6.      The pattern and practice of lending discrimination engaged in by JPMorgan consists of traditional redlining[5] and reverse redlining,[6] both of which have been deemed to violate the FHA by federal courts throughout the country. JPMorgan engaged in redlining, and continues to engage in said conduct, by refusing to extend mortgage credit to minority borrowers in Miami on equal terms as offered to non-minority borrowers. JPMorgan engaged in reverse redlining, and continues to engage in said conduct, by extending mortgage credit on predatory terms to minority borrowers in minority neighborhoods in Miami on the basis of the race or ethnicity of its residents. Federal Reserve Chairman Ben Bernanke recently acknowledged these twin evils of mortgage discrimination and explained that both types of mortgage discrimination "continue to have particular significance to mortgage markets."[7]

7.      Major banks such as JPMorgan have a long history of engaging in redlining throughout Miami. That practice began to change in the late 1990s, when JPMorgan adapted to changing market conditions and began to flood historically underserved minority communities with mortgage loans that consisted of a variety of high cost and abusive mortgage loan products with predatory terms as compared to the mortgage loans issued to white borrowers (reverse redlining).

8.      JPMorgan's discriminatory lending practices have the purpose and effect of placing vulnerable, underserved borrowers in loans they cannot afford. Reverse redlining maximizes JPMorgan's profit without regard to the borrower's best interest, the borrower's ability to repay, or the financial health of underserved minority neighborhoods. Moreover, JPMorgan has averted any significant risk to itself by selling the vast majority of mortgage loans it originates or purchases on the secondary market (collectively "JPMorgan Loans").

9.      Between 1996-2006, one category of discriminatory loan products – subprime loans – grew throughout the country from $97 billion to $640 billion. These loans were

---

[5] Redlining is the practice of denying credit to particular neighborhoods based on race.

[6] Reverse redlining is the practice of flooding a minority community with exploitative loan products.

[7] Remarks by Federal Reserve Chairman Ben Bernanke at the Operation HOPE Global Financial Dignity Summit, Atlanta, Georgia, at 10 (Nov. 15, 2012), *available at* www.federalreserve.gov/newsevents/speech/bernanke20121115a.htm.

frequently targeted to minorities. Upon information and belief, the lack of accessible credit resulting from JPMorgan's previous pattern and practice of redlining in the minority communities in Miami created conditions whereby the Bank could easily target and exploit the underserved minority communities who due to traditional redlining had been denied credit.

10.     Thereafter, following several years of issuing abusive, subprime mortgage loans throughout the minority communities of Miami, commencing in or around 2007, JPMorgan once again adapted to changing market conditions while continuing its pattern and practice of issuing a variety of discriminatory loan products. Simultaneously, Miami and other communities throughout the country experienced a curtailment of mortgage credit issued to minority borrowers.[8] JPMorgan is one of the largest mortgage lenders doing business in Miami and its policies and practices contributed to this problem. In other words, JPMorgan not only refused to extend credit to minority borrowers when compared to white borrowers, but when the Bank did extend credit, it did so on predatory terms. This combination of reverse redlining and redlining represents a continuing and unbroken pattern and practice of mortgage lending discrimination in Miami that still exists today.

11.     JPMorgan's pattern and practice of *reverse redlining* has caused an excessive and disproportionately high number of foreclosures on the JPMorgan Loans it has made in the minority neighborhoods of Miami. Foreclosures on loans originated by JPMorgan are concentrated in these neighborhoods. *A loan in a predominantly minority neighborhood is 4.629 times more likely to result in foreclosure than a loan in a neighborhood with a majority of white residents.*

12.     JPMorgan's pattern and practice of *traditional redlining* has also caused an excessive and disproportionately high number of foreclosures in the minority neighborhoods of Miami. These foreclosures often occur when a minority borrower who previously received a predatory loan sought to refinance the loan, only to discover that JPMorgan refused to extend credit at all, or on equal terms as when refinancing similar loans issued to white borrowers. The

---

[8] Center for Responsible Lending, *The State of Lending in America & its Impact on U.S. Households* (2012), *available at* http://www.responsiblelending.org/state-of-lending/State-of-Lending-report-1.pdf); Harvard School of Public Health, *Home Purchase Loan Denial Rate By Race/Ethnicity* (2010), *available at* http://diversity data.sph.harvard.edu/Data/Rankings/Show.aspx?ind=9).

inevitable result of the combination of issuing a predatory loan, and then refusing to refinance the loan, was foreclosure.

13.    JPMorgan would have had comparable foreclosure rates in minority and white communities if it had properly and uniformly applied responsible underwriting practices in both areas. JPMorgan possesses sophisticated underwriting technology and data that allows it to predict with precision the likelihood of delinquency, default, or foreclosure. The fact that JPMorgan's foreclosures are so disproportionately concentrated in minority neighborhoods is not the product of random events. To the contrary, it reflects and is fully consistent with JPMorgan's practice of targeting minority neighborhoods and customers for discriminatory practices and predatory pricing and products. It also reflects and is consistent with JPMorgan's practice of failing to underwrite minority borrowers' applications properly, and of putting these borrowers into loans which (1) have more onerous terms than loans given to similarly situated white borrowers, and (2) the borrowers cannot afford, leading to foreclosures.

14.    The Bank's predatory and discriminatory lending practices are evidenced by information from confidential witness statements provided by former employees of JPMorgan (discussed further herein). For example:

a)    "Everybody knew that there was a lot of fraud. . . . Everybody was going over their head . . . I think the fault was originally with the banks because guidelines were so lenient."

b)    "We are paid on commission only. We earn money only when we close the loan. If they (the borrowers) come in, fit in the loan program, want the program, and are of sound mind, who am I to stand up and blow the whistle?"

c)    "[Immigrant customers] take your advice because you are from the Bank. You're like a doctor or lawyer. These are blue-collar workers. They are taking your advice. They'll listen to what you say. It was easy to coerce them . . . They were talked into how good the American Dream is, we told them, 'You can do this; I know you can do this . . . This is your opportunity to give yourself a slice of the American Dream.'"

d)    Hispanics "absolutely" used the "no doc" loans at higher percentages than whites. "That was perfect for them."

e)      "The interest only loans -- that got people in there to buy houses they could not afford."

f)      "I absolutely heard managers [telling loan officers to increase the borrower's income level, assets and/or education level to qualify the borrower] . . . Not just once. A bunch of times . . . They'd say, 'Tweak that file. Give them a college education.'"

g)      "The pressure for employees to produce created an environment where people were buying homes they shouldn't be buying . . . There was so much pressure from the Bank to do big numbers. Even for management. Their jobs were threatened if they didn't have the numbers on the board . . . It's the guy who brings in the $20 million (who's praised), but nine times out of 10, those people are committing fraud."

15.     The reports of these witnesses are confirmed when Miami data on JPMorgan loans is examined. Such an examination reveals a widespread practice of discrimination. For example, a regression analysis that controls for credit history and other factors demonstrates that an African-American JPMorgan borrower was 5.251 times more likely to receive a predatory loan than a white borrower, and a Hispanic borrower 2.099 times more likely. The regression analysis confirms that African-Americans with FICO scores over 660 are 4.510 times more likely to receive a predatory JPMorgan loan than a white borrower, and a Hispanic borrower 1.954 times more likely.

16.     The Office of the Comptroller of the Currency and the Board of Governors of the Federal Reserve System brought an action alleging that certain large banks, including JPMorgan, engaged in mortgage lending related misconduct that induced a national foreclosure crisis. In connection with that action, JPMorgan entered into a settlement agreement with the government pursuant to which JPMorgan will: (a) make a cash payment of $753 million into a settlement fund for distribution to qualified borrowers; and (b) provide an additional $1.2 billion to foreclosure prevention actions.

17.     In November 2013, JPMorgan entered into a $13 billion settlement with the U.S. Department of Justice and various federal and state partners relating to the packaging, marketing, sale and issuance of residential mortgage backed securities by JPMorgan, Washington Mutual, and Bear Stearns. JPMorgan acknowledged that it made serious misrepresentations to the public

6

in connection with these securities. Under the terms of the settlement, $9 billion will be paid to settle federal and state claims, and $4 billion will be paid to assist consumers harmed by the unlawful conduct.

18.     In 2012, JPMorgan Chase and four other large mortgage servicers agreed to a global settlement with the U.S. Department of Justice, the U.S. Department of Housing and Urban Development, the Consumer Financial Protection Bureau, and the state attorneys general. The settlement relates to unethical mortgage origination and servicing activities similar to the activities alleged herein. Under the settlement, JPMorgan will make cash payments of approximately $1.1 billion to 50 states (with a set aside to certain borrowers); offer approximately $500 million of refinancing to certain borrowers; and provide approximately $3.7 billion of additional payments for certain borrowers.

19.     The past several years have been highly profitable for JPMorgan. According to recent press releases, the Bank generated a record amount of (i) net income ($19.9 billion) and (ii) diluted earnings per share ($5.22). The following charts illustrate these results.

Net Income (millions)



Earnings per share



20.    At the same time that JPMorgan achieved record financial success, the Bank's discriminatory practices and resulting foreclosures in the City's minority neighborhoods have inflicted significant, direct, and continuing non-economic and economic harm to the City.

21.    In addition to reverse redlining, JPMorgan has induced foreclosures since 2009 by failing to extend branch support to minority neighborhoods, pulling existing Bank support from minority neighborhoods, declining to offer refinancing or loan modifications to minority customers on fair terms, and otherwise denying minority borrowers equal access to fair credit.

22.    Because of the multitude of analytic tools available to JPMorgan to determine the likelihood that a particular mortgage loan would result in default by the borrower, as well as the existence of various studies, reports, and other pertinent literature specifically addressing the connection between mortgage loans and foreclosures, it was foreseeable that JPMorgan knew, or should have known, that a predatory or high risk loan issued to an African-American or Hispanic in certain neighborhoods in Miami would result in default and subsequent foreclosure. Moreover, because JPMorgan maintains numerous branch offices throughout Miami, and has knowledge of the specific address for each loan it issued, it was foreseeable that JPMorgan knew, or should have known, of the condition of foreclosed properties corresponding to loans that it issued in Miami regardless of whether it serviced the loan or subsequently sold the servicing rights to a third party.

8

23.     According to Federal Reserve Chairman Bernanke, "foreclosures can inflict economic damage beyond the personal suffering and dislocation that accompany them. Foreclosed properties that sit vacant for months (or years) often deteriorate from neglect, adversely affecting not only the value of the individual property but the values of nearby homes as well. Concentrations of foreclosures have been shown to do serious damage to neighborhoods and communities, reducing tax bases and leading to increased vandalism and crime. Thus, the overall effect of the foreclosure wave, especially when concentrated in lower-income and minority areas, is broader than its effects on individual homeowners."[9]

24.     The discriminatory lending practices at issue herein have resulted in what many leading commentators describe as the "greatest loss of wealth for people of color in modern US history." It is well-established that poverty and unemployment rates for minorities exceed those of whites, and therefore, home equity represents a disproportionately high percentage of the overall wealth for minorities.[10] As Federal Reserve Chairman Bernanke recently explained, as a result of the housing crisis, "most or all of the hard-won gains in homeownership made by low-income and minority communities in the past 15 years or so have been reversed."[11] The resulting impact of these practices represents "nothing short of the preeminent civil rights issue of our time, erasing, as it has, a generation of hard fought wealth accumulation among African Americans."[12]

## II.     PARTIES

25.     Plaintiff City of Miami is a Florida municipal corporation. The City has maintained an active and longstanding interest in the quality of life and the professional opportunities that attend an integrated community. One way that the City has furthered these

---

[9] Bernanke, *supra* p. 4 n.7.

[10] Robert Schwemm and Jeffrey Taren, *Discretionary Pricing, Mortgage Discrimination, and the Fair Housing Act*, 45 HARVARD CIVIL RIGHTS-CIVIL LIBERTIES LAW REV. 375, 382 (2010).

[11] Bernanke, *supra* p. 3 n.7.

[12] Charles Nier III and Maureen St. Cyr, *A Racial Financial Crisis: Rethinking the Theory of Reverse Redlining to Combat Predatory Lending Under the Fair Housing Act*, 83 TEMPLE LAW REV. 941, 942 (2011).

interests is through its Department of Community and Economic Development, which is charged with responsibility for operating the City's fair housing program, reducing illegal housing discrimination, monitoring and investigating fair housing complaints, supporting fair housing litigation, and conducting research and studies to identify and address fair housing impediments as a means of improving the overall quality of life in the city. The City is authorized by the City Commission to institute suit to recover damages suffered by the City as described herein.

26.     Defendant JPMorgan Chase & Co. ("JPMorgan & Co."), headquartered in New York, New York, operates under two brand names: JPMorgan and J.P.Morgan. The U.S. consumer and commercial banking businesses operate under the JPMorgan brand, and include its home finance and home equity loan business. JPMorgan & Co., in its current structure, is the result of the combination of several large U.S. banking companies over the last decade including JPMorgan Manhattan Bank, J.P. Morgan & Co., Bank One, Bear Stearns and Washington Mutual. Upon information and belief, Plaintiff alleges that JPMorgan & Co. owns and/or operates JPMorgan Chase Bank, N.A. and JPMorgan Manhattan Bank USA, N.A. JPMorgan & Co. operates a Consumer & Community Banking segment, which includes a mortgage banking business (*i.e.*, mortgage production, servicing, and real estate portfolios).

27.     On September 25, 2008 the Office of Thrift Supervision seized Washington Mutual's ("WaMu") assets and operations and placed them into receivership with the Federal Deposit Insurance Corporation ("FDIC"). Pursuant to a Purchase and Assumption Agreement ("Agreement"), the FDIC later sold substantially all of WaMu's assets and a significant amount of its liabilities to JPMorgan & Co. for $1.9 billion.

28.     The 2008 JPMorgan Annual Report stated that the WaMu "deal was financially compelling – it was immediately accretive to earnings, and it will add an estimated $2 billion or 50 cents per share to our 2009 results and increase more thereafter." The Report further explained that "[w]ith the acquisition of WaMu, we purchased approximately $240 billion of mortgage and mortgage related assets, $160 billion in deposits and $38 billion in equity. We immediately wrote down most of the bad or impaired assets (approximately $31 billion), properly reserved for the remaining assets, and established reserves for severance and close-down costs." The Report also stated that "[o]ur due diligence on WaMu's assets was extensive, and our assumptions were conservative. We assumed that home prices would go down another 10% (from the day we closed), providing a healthy margin for error. However, if home prices go

10

down more than expected, say 20%, all other things being equal, this could cost us $5billion - $10 billion more. Even under these circumstances, we think the transaction will remain a great deal, at a great price for our shareholders. We are confident that it will add enormous value to JP Morgan Chase in the future."[13]

29.     The liabilities assumed by JPMorgan & Co. include the claims alleged by Miami herein, which, as a matter of fact, were reflected on the Books and Records of WaMu as of September 25, 2008 based upon pertinent accounting principles.

30.     Section 2.1 of the Agreement titled "Liabilities Assumed by Assuming Bank" provides as follows:

> Subject to Sections 2.5 and 4.8 the Assuming Bank [JPMorgan & Co.] Chase] expressly assumes at Book Value (subject to adjustment pursuant to Article VIII) and agrees to pay, perform, and discharge, all of the liabilities of the Failed Bank [WaMu] which are reflected on the Books and Records of [WaMu] as Bank Closing [September 25, 2008], including the Assumed Deposits and all liabilities associated with any an all employee benefit plans, except as listed on the attached Schedule 2.1, and as otherwise provided in this Agreement (such liabilities referred to as "Liabilities Assumed"). Notwithstanding Section 4.8, [JPMorgan & Co.] specifically assumes all mortgage servicing rights and obligations of [WaMu].

31.     Section 2.5 of the Agreement titled "Borrower Claims" provides as follows:

> Notwithstanding anything to the contrary in this Agreement, any liability associated with *borrower* claims for payment of or liability to any *borrower* for monetary relief, or that provide for any other form of relief to any *borrower*, whether or not such liability is reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, legal or equitable, judicial or extra-judicial, secured or unsecured, whether asserted affirmatively or defensively, related in any way to any loan or commitment to lend made by the Failed Bank [WaMu] prior to failure, or to any loan made by a third party in connection with a loan which is or was held by [WaMu], or otherwise arising in connection with [WaMu's] lending or loan purchase activities are specifically not assumed by the Assuming Bank [JPMorgan & Co.]. (emphasis added).

---

[13]     http://www.investor.shareholder.com/jpmorganchase/.annual.cfm.2008 (p. 10).

11

32.     Miami is not a borrower, it is not pursing a derivative claim on behalf of any borrower, and is not seeking damages on behalf of any borrower. Therefore, the exclusion for borrower claims set forth in Section 2.5 of the Agreement does not enable JPMorgan & Co. to avoid liability corresponding to claims pertaining to WaMu's mortgage originations at issue herein. Rather, in accordance with Section 2.1, JPMorgan & Co. is liable for these mortgage originations.

33.     According to JPMorgan's 2012 10-K, "Mortgage Banking includes mortgage origination and servicing activities, as well as portfolios comprised of residential mortgages and home equity loans, including the purchased credit impaired ("PCI") portfolio acquired in the Washington Mutual transaction."

34.     Defendant JPMorgan Chase Bank, N.A. ("JPMorgan Bank") is organized as a national banking association under the laws of the United States. Upon information and belief, its corporate headquarters are located in New York, New York. It maintains multiple offices in the State of Florida and specifically in the City of Miami, for the purposes of soliciting applications for and making residential mortgage loans and engaging in other business activities. JPMorgan Bank also acquired JPMorgan Manhattan Bank USA, N.A. ("JPMorgan Manhattan").

35.     Defendant JPMorgan Manhattan Bank USA, N.A. is headquartered in New York, New York. Upon information and belief, Plaintiffs allege that JPMorgan Manhattan engaged in residential mortgage lending in Florida and other states throughout the country.

36.     The Defendants in this action are, or were at all relevant times, subject to Federal laws governing fair lending, including the FHA and the regulations promulgated under each of those laws. The FHA prohibits financial institutions from discriminating on the basis of, *inter alia*, race, color, or national origin in their residential real estate-related lending transactions.

37.     The Defendants in this action are or were businesses that engage in residential real estate-related transactions in the City of Miami within the meaning of the FHA, 42 U.S.C. § 3605.

38.     Based on information reported pursuant to the Home Mortgage Disclosure Act, in addition to loans that JPMorgan originated directly, Defendants are responsible for residential home loans acquired from, and/or sold by or through, WaMu, JPE Home Finance LLC, Long Beach Mortgage Co., Encore Credit Corp., Bear Stearns Residential Mortgage, Performance Credit Corp., and Bravo Credit Corp.

39.     Upon information and belief, Plaintiff alleges that each of the Defendants was and is an agent of the other Defendants. Each Defendant, in acting or omitting to act as alleged in this Complaint, was acting in the course and scope of its actual or apparent authority pursuant to such agencies, and/or the alleged acts or omissions of each Defendant as agent were subsequently ratified and adopted by each agent as principal. Each Defendant, in acting or omitting to act as alleged in this Complaint, was acting through its agents, and is liable on the basis of the acts and omissions of its agents.

### III.     JURISDICTION AND VENUE

40.     This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 3613 and 28 U.S.C. §§ 1331, 1343, because the claims alleged herein arise under the laws of the United States.

41.     Venue is proper in this district under 28 U.S.C. § 1391(b) because JPMorgan conducts business in this district and a substantial part of the events and omissions giving rise to the claims occurred in this district.

### IV.     FACTUAL BACKGROUND

**A.     Background Regarding Discriminatory Loan Practices, Reverse Redlining, and Redlining.**

42.     Prior to the emergence of subprime lending, most mortgage lenders made only "prime" loans. Prime lending offered uniformly priced loans to borrowers with good credit, but individuals with lower credit were not eligible for prime loans.

43.     Subprime lending developed and began growing rapidly in the mid-1990s as a result of technological innovations in risk-based pricing and in response to the demand for credit by borrowers who were denied prime credit by traditional lenders. Advances in automated underwriting allowed lenders to predict with improved accuracy the likelihood that a borrower with lower credit will successfully repay a loan. These innovations gave lenders the ability to adjust the price of loans to match the different risks presented by borrowers whose credit records did not meet prime standards. Lenders found that they could now accurately price loans to reflect the risks presented by a particular borrower. When done responsibly, this made credit available much more broadly than had been the case with prime lending.

44.     Responsible subprime lending has opened the door to homeownership to many people, especially low- to moderate-income and minority consumers, who otherwise would have

been denied mortgages. At the same time, however, subprime lending has created opportunities for unscrupulous lenders to target minorities and engage in discriminatory, irresponsible lending practices that result in loans that borrowers cannot afford. This, in turn, leads directly to defaults and foreclosures.

45.     Enticed by the prospect of profits resulting from exorbitant origination fees, points, and related pricing schemes, some irresponsible subprime lenders took advantage of a rapidly rising real estate market to convince borrowers to enter into discriminatory loans that had unfair terms that they could not afford. Often this was accomplished with the help of deceptive practices and promises to refinance at a later date. These abusive subprime lenders did not worry about the consequences of default or foreclosure to their business because, once made, a significant number of the loans were sold on the secondary market.

46.     As the subprime market grew, the opportunities for abusive practices grew with it.[14] As a consequence, the federal government has found that abusive and predatory practices "are concentrated in the subprime mortgage market."[15] These practices, which in recent years have become the target of prosecutors, legislators, and regulators, include the following:

> a.      Placing borrowers in subprime loans even though they qualify for loans on better terms.
>
> b.      Failing to prudently underwrite hybrid adjustable rate mortgages (ARMs), such as 2/28s and 3/27s.[16] After the borrower pays a low "teaser rate" for the first two or three years, the interest rate on these

---

[14] United States Department of Housing and Urban Development Office of Policy Development and Research, *Report to Congress on the Root Causes of the Foreclosure Crisis*, at 52 (2010) ("While many factors have undoubtedly contributed to the recent rise in foreclosures, as discussed earlier, no small part of the increase stems from recent increases in abusive forms of subprime lending"), *available at* http://www.huduser.org/portal/Publications/PDF/Foreclosure_09.pdf.

[15] United States Department of Housing & Urban Development and United States Department of the Treasury, *Curbing Predatory Home Mortgage Lending*, at 1 (2000), *available at* http://www.huduser.org/Publications/pdf/treasrpt.pdf ("HUD/Treasury Report").

[16] In a 2/28 ARM, the "2" represents the number of years the mortgage will be fixed over the term of the loan, while the "28" represents the number of years the interest rate paid on the mortgage will be variable. Similarly, in a 3/27 ARM, the interest rate is fixed for three years and variable for the remaining 27-year amortization.

14

loans resets to a much higher rate that can continue to rise based on market conditions. Subprime lenders often underwrite these loans based only on consideration of whether the borrower can make payments during the initial teaser rate period, without regard to the sharply higher payments that will be required for the remainder of a loan's 30-year term. Irresponsible lenders aggressively market the low monthly payment that the borrower will pay during the teaser rate period, misleading borrowers into believing that they can afford that same low monthly payment for the entire 30-year term of the loan, or that they can refinance their loan before the teaser rate period expires.

c.     Failing to prudently underwrite refinance loans, where borrowers substitute unaffordable mortgage loans for existing mortgages that they are well-suited for and that allow them to build equity. Such refinanced loans strip much or even all of that equity by charging substantial new fees, often hiding the fact that the high settlement costs of the new loan are also being financed. Lenders that aggressively market the ability of the borrower to pay off existing credit card and other debts by refinancing all of their debt into one mortgage loan mislead borrowers into believing that there is a benefit to debt consolidation, while obscuring the predictable fact that the borrower will not be able to repay the new loan. The refinanced loans are themselves often refinanced repeatedly with ever-increasing fees and higher interest rates, and with ever-decreasing equity, as borrowers seek to stave off foreclosure.

d.     Allowing mortgage brokers to charge "yield spread premiums" for qualifying a borrower for an interest rate that is higher than the rate the borrower qualifies for and can actually afford.

e.     Failing to underwrite loans based on traditional underwriting criteria such as debt-to-income ratio, loan-to-value ratio, FICO score, and work history. These criteria ensure that a borrower is obtaining a loan that he or she has the resources and assets to repay, and ignoring these criteria results in many loans that bear no relation to borrowers' ability to

repay them. This allows the lender to make a quick profit from the origination, but sets the borrower up for default and foreclosure.

f.   Requiring substantial prepayment penalties that prevent borrowers whose credit has improved from refinancing their subprime loan to a prime loan. Prepayment penalties not only preclude borrowers from refinancing to a more affordable loan, but reduce the borrowers' equity when a subprime lender convinces borrowers to needlessly refinance one subprime loan with another.

g.   Charging excessive points and fees that are not associated with any increased benefits for the borrower.

47.   The problem of predatory practices in mortgage lending is particularly acute in minority communities because of "reverse redlining." As used by Congress and the courts, the term "reverse redlining" refers to the practice of targeting residents in certain geographic areas for credit on unfair terms due to the racial or ethnic composition of the area. This is in contrast to "redlining," which is the practice of denying equal access to credit to specific geographic areas because of the racial or ethnic composition of the area. Both practices have repeatedly been held to violate the Federal Fair Housing Act.

48.   Following the onset of the subprime mortgage crisis, and after years of issuing abusive home loans in minority neighborhoods, the big bank lenders began to limit the issuance of mortgage credit to minority borrowers (*i.e.*, refusing to refinance predatory loans). At the same time, when the big banks did extend credit, they continued to do so on predatory terms.

## V.   JPMORGAN ENGAGED IN DISCRIMINATORY LENDING PRACTICES.

### A.   JPMorgan's Conduct Had a Disparate Impact on Minority Borrowers in Violation of the Fair Housing Act.

#### 1.   Discriminatory lending results in a disproportionate number of foreclosures in minority areas.

49.   Foreclosures are on the rise in many of the nation's most vulnerable neighborhoods, particularly those with substantial concentrations of minority households. The increase appears to stem from the growing presence of (1) non-conventional lending in these

communities and (2) continuing discriminatory lending practices (*e.g.*, steering minorities into loan products with more onerous terms – which happen to be more profitable for JPMorgan).

50.     A seminal report on foreclosure activity by Mark Duda and William Apgar documents the negative impact that rising foreclosures have on low-income and low-wealth minority communities, using Chicago as a case study.[17] Mr. Apgar is a Senior Scholar at the Joint Center for Housing Studies of Harvard University, and a Lecturer on Public Policy at Harvard's John F. Kennedy School of Government. He previously served as the Assistant Secretary for Housing/Federal Housing Commissioner at the U.S. Department of Housing and Urban Development, and also Chaired the Federal Housing Finance Board. Mr. Apgar holds a Ph.D. in Economics from Harvard University. Mr. Duda is a Research Fellow at the Joint Center for Housing Studies. The Apgar-Duda report has continually been cited by subsequent governmental, public sector, and private sector reports due to its clarity and thoroughness with respect to the negative impact foreclosures have on lower-income and minority neighborhoods.[18]

51.     This significant report highlights the foreseeability of foreclosures arising from predatory lending practices and their attendant harm, demonstrating that such foreclosures impose significant and predictable costs on borrowers, municipal governments, and neighboring homeowners.

52.     Another report, by the Center for Responsible Lending, uses a national dataset to show that the foreclosure rate for low- and moderate-income African-Americans is approximately 1.8 times higher than it is for low- and moderate-income non-Hispanic whites. The gap is smaller for Hispanics, especially among low-income households, but even among low-income Hispanics the foreclosure rate is 1.2 times that of low-income whites. Racial and ethnic disparities in foreclosure rates cannot be explained by income, since disparities persist even among higher-income groups. For example: approximately 10 percent of higher-income African-American borrowers and 15 percent of higher-income Hispanic borrowers have lost their

---

[17]     This report, and others cited in the First Amended Complaint, further corroborate the allegations specifically pertaining to the City of Miami.

[18] *See* W. Apgar, M. Duda & R. Gorey, *The Municipal Costs of Foreclosures: A Chicago Case Study* (2005), *available at* http://www.nw.org/network/neighborworksProgs/foreclosuresolutions/documents/2005Apgar-DudaStudy- FullVersion.pdf.

home to foreclosure, compared with 4.6 percent of higher income non-Hispanic white borrowers. Overall, low- and moderate-income African-Americans and middle- and higher-income Hispanics have experienced the highest foreclosure rates.[19]

53.     Nearly 20 percent of loans in high-minority neighborhoods have been foreclosed upon or are seriously delinquent, with significant implications for the long-term economic viability of these communities.[20]

### 2.     Minority neighborhoods are disproportionate recipients of predatory loans.

54.     There is a substantial body of empirical evidence demonstrating the prevalence of reverse redlining in the subprime mortgage market. These studies show that, even after controlling for creditworthiness and other legitimate underwriting factors, subprime loans and the predatory practices often associated with subprime lending are disproportionately targeted at minority neighborhoods.[21]

55.     In general, as recently observed by the Federal Reserve in December 2012, both African-American and Hispanic borrowers were far more likely (in fact, nearly twice as likely) to obtain higher-priced loans than were white borrowers. These relationships hold both for home-

---

[19] Center for Responsible Lending, *Lost Ground, 2011: Disparities in Mortgage Lending and Foreclosures* (2011), *available at* www.responsiblelending.org/mortgage-lending/research--analysis/*Lost-Ground-2011*.pdf.

[20] *Id.*

[21] *See* Abt Associates, *Using Credit Scores to Analyze High-Cost Lending in Central City Neighborhoods* (2008); Center for Responsible Lending, *Lost Ground, 2011: Disparities in Mortgage Lending and Foreclosures* (2011), *available at* www.responsiblelending.org/-mortgage-lending/research-analysis/*Lost-Ground-2011*.pdf; Center for Responsible Lending, *Unfair Lending: The Effect of Race and Ethnicity on the Price of Subprime Mortgages* (2006), *available at* http://www.responsiblelending.org/mortgage-lending/research-analysis/rr011-Unfair_Lending-0506.pdf; Finance and Economics Discussion Series Divisions of Research & Statistics and Monetary Affairs Federal Reserve Board, Washington, D.C, *Subprime Mortgages: What, Where, and to Whom?* (2008), *available at* http://www.nber.org/papers/w14083.pdf?new_window=1; C. Reid and E. Laderman, Federal Reserve Bank of San Francisco, *The Untold Costs of Subprime Lending: Examining the Links among Higher-Priced Lending, Foreclosures and Race in California*, Presented at Brandeis University (2009), *available at* http://iasp.brandeis.edu/pdfs/Author/reid-carolin/The%20Untold%20Costs%20of%20Subprime%20Lending%203.pdf .

purchase and refinance lending and for non-conventional loans. These differences are reduced, but not eliminated, after controlling for lender and borrower characteristics. "Over the years, analyses of HMDA data have consistently found substantial differences in the incidence of higher-priced lending [] across racial and ethnic lines, differences that cannot be fully explained by factors included in the HMDA data."[22]

56.     African-Americans and Hispanics were much more likely to receive subprime loans and loans with features that are associated with higher foreclosures, specifically prepayment penalties and hybrid or option ARMs. These disparities were evident even comparing borrowers within the same credit score ranges. In fact, the disparities were especially pronounced for borrowers with higher credit scores. For example, among borrowers with a FICO score of over 660 (indicating good credit), African-Americans and Hispanics received a high interest rate loan more than three times as often as white borrowers.[23]

57.     In addition to receiving a higher proportion of higher-rate loans, African-Americans and Hispanics also were much more likely to receive loans with other risky features, such as hybrid and option ARMs and prepayment penalties. Disparities in the incidence of these features are evident across all segments of the credit spectrum.[24]

58.     Since 2008, as the data discussed below makes clear, there has been a shift in the types of loans issued – and not issued – by the Bank. For example, the Bank shifted from offering new subprime loans toward issuing more Home Equity Lines of Credit ("HELOCs") and higher cost loans including, but not limited to, FHA/VA loans.[25] FHA and VA government loans are characterized as higher risk loans because they are typically more expensive for a borrower than conventional loans and include fees and costs not associated with conventional

---

[22] Federal Reserve Bulletin, *The Mortgage Market in 2011: Highlights from the Data Reported under the Home Mortgage Disclosure Act* (Dec. 2012), *available at* http://www.federalreserve.gov/pubs/bulletin/2012/PDF/2011_HMDA.pdf.

[23] Center for Responsible Lending, *Lost Ground, 2011*, *supra* n.17.

[24] *Id.*

[25] While FHA/VA loans are not inherently predatory, these loans have higher risk features such as higher fees and higher interest rates. When banks target minorities for FHA/VA loans and issue more of them to minorities, they are acting in a discriminatory manner.

loans.[26] Additionally, this fact is further corroborated by the FHA/VA Mortgage Programs webpage for one of the defendant banks in the City's predatory lending cases – Wells Fargo. According to Wells Fargo's website: (a) "In many instances, you may find FHA to be a more expensive financing option and should be considered after thoroughly evaluating all other product options that meet your credit qualifying and financial needs;" (b) "You typically have to pay upfront and monthly FHA mortgage insurance premiums;" and (c) "You typically have to pay a one-time VA funding fee that can be financed into the loan amount."[27]

59.    At the same time, in the last several years, JPMorgan tightened lending requirements in a manner that drastically limited the ability of minority borrowers to refinance or otherwise modify the subprime loans previously issued by the Bank.

60.    While conventional credit has contracted over the past five years, FHA lending has expanded dramatically. During the subprime boom, FHA lending fell as subprime lenders targeted minority communities. Now, with little or no subprime lending, and conventional credit restricted, FHA lending has shot up. Overall, the share of loans with government backing went from 5% in 2005 to 26.6% in 2010.[28]

61.    For African-Americans, the share of mortgages used to purchase a home and backed by a government program increased to almost 80% in 2010; for Hispanics the share increased to 73%. But for whites, the share increased to only 49%. At present, most minority borrowers cannot gain access to the conventional mortgage market, and instead, are relegated to more expensive FHA loans.[29]

---

[26] California Reinvestment Coalition, et al., *Paying More for the American Dream VI, Racial Disparities in FHA/VA Lending* (July 2012); www.fha.com/fha_loan_types; www.benefits.va.gov/homeloans.

[27]       https://www.wellsfargo.com/mortgage/loan-programs/fha-va-loans.

[28] Center for Responsible Lending, *supra* n.8.

[29] *Id*.

**B.**    **JPMorgan Intentionally Discriminated Against Minority Borrowers in Violation of the Fair Housing Act, as Demonstrated by Former Bank Employees.**

62.    Confidential Witnesses ("CWs") are former employees of JPMorgan and WaMu. The CWs were responsible for making, processing, and/or underwriting loans in the greater Miami region. CWs describe how JPMorgan and WaMu targeted minorities and residents of minority neighborhoods in and around Miami for predatory lending practices.

63.    CW1 worked in Miami for JP Morgan as a subprime wholesale mortgage representative from 2004 to 2008 and as a loan officer and personal banker from 2009 to 2010. As a wholesale mortgage rep, her job was to developed business relationships with mortgage brokers in Miami so they would bring loan applications to the Bank.

64.    CW2 was a mortgage loan officer for JPMorgan at a Miami area branch from 1995 to 2008.

65.    CW3 was a branch manager of a Miami area branch of JP Morgan Chase from 2007 to 2008.

66.    CW4 was a loan originator at JP Morgan from 1996 to 2008. During the height of the real estate boom, she worked at a Fort Lauderdale branch, but most of her customers and loans originated from the Miami-Dade area. About 45 to 50 percent of her customers were Hispanic.

67.    The CWs confirm that JPMorgan has engaged in predatory and otherwise discriminatory lending practices directly and/or through acquired lenders (including WaMu).

**1.**    **JPMorgan targets minorities for predatory loan terms (and pays its employees more for doing so).**

68.    According to CW2, from and after 2004, JPMorgan expanded its efforts to reach out to minorities in Miami. The Bank printed marketing materials in Spanish and English to appeal to Hispanics in Miami.

69.    CW2 said that JPMorgan loan officers worked with minorities, such as Hispanics, who qualified for loans by showing the pooled cash flow of several family members. Typically, one member of the family would obtain the loan, while several members would sign the deed, she said. This enabled hundreds, if not thousands, of members of the Hispanic community in the City of Miami to qualify to buy homes they would not otherwise be able to afford. She explained that these loans had a high rate of default and eventually led to a rash of foreclosures.

70.     CW3's bank branch was in a relatively wealthy white community, but the majority of the customers were minorities (including Hispanics and Haitians).    CW3 said the undereducated and financially naive immigrant customer base made it easy to convince them to take out loans. "You talk them into it," CW3 said. "You convince them. They take your advice because you are from the bank. You're like a doctor or lawyer. These are blue-collar workers. They are taking your advice. They'll listen to what you say. It was easy to coerce them. All they could see was money."

71.     CW3 explained that employees were trained to sell customers on the American Dream, convincing them that borrowing large sums to buy a home, invest in a second home, or simply take cash out to pay for their lifestyle was the American way. Bank employees knew recent immigrant customers who were desperate to buy a house were an easy target. "They believe in the American Dream, so they'll go any way you lead them," CW3 said. "They were talked into how good the American Dream is, we told them, 'You can do this, I know you can do this. Just think, you can have money to buy investment property too.'"

72.     CW3 also observed that the Bank's managers taught employees to tell customers, "This is your opportunity to give yourself a slice of the American Dream." Employees were also told by managers, "If you can talk (customers) into purchasing a home, the branch will be successful, the bank will be successful." Employees were further told by managers: "These people (customers) don't know what they want, they don't know what they need. It's your job to inspire them."

       **2.      JPMorgan has underwritten short-term teaser rate loans, stated-income loans, interest only loans, and HELOCs that borrowers could not afford.**

73.     CW1 believes that the most common loan sold during the 2004 to 2008 period at JP Morgan was the 100 percent financed "80/20" loan, which was actually two loans – one for 80 percent of the home's value and the second for 20 percent. CW1 explained that the customer base for the subprime market and 80/20 loans in Miami was predominantly Hispanic borrowers. Many of these loans were also teaser rate "2/28" loans, which offered low rates for two years that adjusted upwards throughout the remaining 28 years.

74.     According to CW1, mortgage brokers would convince borrowers to take out teaser rate loans by claiming the borrower could easily refinance before the teaser rate expired and the interest increased.

75.     CW1 said many of the Bank's subprime loans from 2004-2008 were also "stated income" loans, which allowed pervasive fraud and falsified documents into the qualifying process, she said. In CW1's view, "Everybody knew that there was a lot of fraud," including managers at the Bank. She described the fraudulent practices among mortgage brokers as being pervasive in Miami. As a result, CW1 said, customers (mainly Hispanic) were qualifying for loans they couldn't afford. "Everybody was going over their head," she added. "I think the fault was originally with the banks because guidelines were so lenient," she said.

76.     CW2 explained that loan officers were aware that the Bank was making "no-doc" loans, otherwise known as "liar loans," to unqualified applicants. The loan officers had no guidelines or incentives to challenge questionable income claims submitted by borrowers when applying for no-doc loans. These loans, she explained, were very popular in Miami as they allowed minority borrowers who did not have W-2s to qualify for loans on homes they otherwise would not have been able to afford.

77.     "We are paid on commission only," CW2 said. "We earn money only when we close the loan. If they (the borrowers) come in, fit in the loan program, want the program, and are of sound mind, who am I to stand up and blow the whistle? What do I say, 'I kind of think they are lying. But I'm not sure?'" CW2 believes higher-level bank employees must have known what was going on, but she pointed out that many of the regional managers received large commissioned salaries based on the amount of loans sold in their regions. Their incentive was to sell as many loans as possible, too.

78.     CW3 said the pressure on employees from the Bank to sell HELOCs and mortgages led many loan officers to talk customers into loans they did not need and could not afford. Personal bankers and loan officers told customers about the different loan products, mortgages and HELOCs that were available, and pressured them to apply for one. CW3 added that many borrowers were talked into taking HELOCs and other loans by loan officers more eager about make their goals than ensuring it was the right things to do for the borrowers, many of whom were minorities, who did not really understand the implications of taking out such loans.

79.     CW3 said "nine times out of 10" customers at his branch applied for "no doc" loans for homes they could not afford in the City of Miami. He estimated that a solid majority of the "no doc" loans likely contained exaggerated income claims. And in most cases, the Bank

looked the other way. According to CW3, the Bank was well aware of the exaggeration and fraudulent claims in "no doc" loan applications. The Bank also instructed loan officers and branch managers to meet loan goals -- not to verify financial information beyond what the Bank's "no doc" guidelines required.

80.     CW4 explained that JPMorgan would approve "no doc" loans even for 95 percent financed mortgages. "I thought, 'Why are they opening themselves up to this?'" she said. "That was not a good loan." CW4 said Hispanics "absolutely" used the "no doc" loans at higher percentages than whites. "That was perfect for them," she said, explaining that many Hispanics were self-employed and regularly took advantage of loan programs that did not require income verification.

81.     CW4 said that the Bank used an automated software system called Desktop Underwriting to assess whether a customer was qualified for a loan. She explained that Bank managers suggested ways to manipulate the system to obtain approval for customers who were initially denied. For example, she observed managers telling loan officers to increase the borrower's income level, assets and/or education level to qualify the borrower. "I absolutely heard managers say that," CW4 said. "Not just once; a bunch of times." "They used the word 'tweak,'" she said of the false information submitted in the borrowers' applications. "They'd say, 'Tweak that file. Give them a college education.'"

82.     CW4 said JPMorgan kept loan officers under such intense pressure to close loans that it created an environment where employees were more concerned about hitting their numbers than they were about whether the mortgages were good. This lead to placing customers in loans they couldn't afford. "The pressure for employees to produce created an environment where people were buying homes they shouldn't be buying," she said. "There was so much pressure from the Bank to do big numbers. Even for management. Their jobs were threatened if they didn't have the numbers on the board." The employees who were producing big numbers were praised and rewarded, regardless of what the employee was doing to obtain those numbers, CW4 said. "It's the guy who brings in the $20 million (who's praised), but nine times out of 10, those people are committing fraud," she said.

83.     CW4 observed that many borrowers obtained interest-only mortgages because they could not qualify for the loan amount if it included paying down the principal each month. The Bank would qualify the borrower based on the interest only payment, which did not include

24

payment of the loan principal. "The interest only loans -- that got people in there to buy houses they could not afford," CW4 said. Many of these borrowers were unable to make the monthly payments once the interest only time period expired.

84.     JPMorgan (directly and through acquired lenders) does not properly underwrite these loans when made to minorities and in minority neighborhoods. JPMorgan does not adequately consider the borrowers' ability to repay these loans, especially after the teaser rate expires and/or the interest rate increases. The fact that these loans would result in delinquency, default, and foreclosure for many borrowers was, or should have been, clearly foreseeable to JPMorgan at the time the loans were made.

> **3.     JPMorgan induced foreclosures by failing to offer refinancing or loan modifications to minority customers on fair terms, and otherwise limiting equal access to fair credit.**

85.     From and after 2009, CW1 said the Bank "went from one extreme to the other." According to CW1, the Bank's guidelines for qualification became so stringent that it seemed no one could refinance a loan, driving some customers towards foreclosure, which disproportionately impacted Hispanics. For example, she explained, some of the Hispanic borrowers who received stated-income loans now were forced by the Bank to prove up the previously stated income; in effect, the Bank would not allow them to modify their mortgages and they lost their homes.

86.     CW4 added that after the real estate market crashed, the Bank stopped making no doc loans, and generally, the Bank's mortgage lending ground to a halt.

87.     The CW statements show that JPMorgan induced foreclosures by failing to offer refinancing or loan modifications to minority customers on fair terms – which constitutes a particularly egregious form of redlining, given that minority borrowers sought refinancing or loan modifications with respect to bad loans that the Bank previously made to them.

> **4.     JPMorgan engages in other abusive lending practices.**

88.     The Bank set aggressive sales goals, including mortgage loan targets. "It really made (employees) aggressive to push people to take out loans," CW3 said of his personal bankers and loan officers.

**C.    Minorities in Miami Receive Predatory Loan Terms from JPMorgan Regardless of Creditworthiness.**

89.    As discussed herein, JPMorgan's *predatory* loans include, among others: high-cost loans (*i.e.*, loans with an interest rate that was at least three percentage points above a federally-established benchmark), subprime loans, interest-only loans, balloon payment loans, loans with prepayment penalties, negative amortization loans, no documentation loans, and/or ARM loans with teaser rates (*i.e.*, lifetime maximum rate > initial rate + 6%).

90.    Data reported by the Bank and available through public databases shows that minorities in Miami received predatory loan terms from JPMorgan more frequently than white borrowers, regardless of creditworthiness.

91.    A regression analysis of this data controlling for borrower race and objective risk characteristics such as credit history, loan to value ratio, and the ratio of loan amount to income demonstrates that, from 2004-2012, an African-American borrower was 5.251 times more likely to receive a predatory loan than was a white borrower possessing similar underwriting and borrower characteristics. [30] The regression analysis further demonstrates that the odds that a Hispanic borrower would receive a predatory loan were 2.099 times the odds that a white borrower possessing similar underwriting and borrower characteristics would receive a predatory loan. These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Hispanic and white borrowers. [31]

92.    The regression analysis also shows that these disparities persist when comparing only borrowers with FICO scores above 660. An African-American borrower with a FICO score above 660 was 4.510 times more likely to receive a predatory loan than was a white borrower with similar underwriting and borrower characteristics. A Hispanic borrower with a FICO score above 660 was 1.954 times more likely to receive a predatory loan than was a white borrower with similar underwriting and borrower characteristics. These odds ratios demonstrate a pattern

---

[30] As alleged throughout the complaint, all references to the date range 2004-2012 are intended to include the time period up to and including December 31, 2012.

[31] Statistical significance is a measure of probability that an observed outcome would not have occurred by chance. As used in this Complaint, an outcome is statistically significant if the probability that it could have occurred by chance is less than 10%.

of statistically significant differences between African-American and white borrowers and between Hispanic and white borrowers.

93.    A similar regression analysis taking into account the racial makeup of the borrower's neighborhood rather than the individual borrower's race shows that borrowers in heavily minority neighborhoods in Miami were more likely to receive predatory loans than borrowers in heavily white neighborhoods. For example, a borrower in a heavily minority census tract (census tract consisting of at least 90% African-American or Hispanic households) was 2.146 times more likely than was a borrower with similar characteristics in a non-minority neighborhood (census tract with at least 50% white households) to receive a predatory loan. These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Hispanic and white borrowers.

94.    This data also establishes that JPMorgan disproportionately issued loans with higher risk features including government loans (FHA/VA) and other high cost loans to African-American and Hispanic borrowers in Miami from 2008-2012. A regression analysis controlling for borrower race and objective risk characteristics such as ratio of loan amount to income demonstrates that an African-American borrower was 3.836 times more likely to receive one of these loans with higher risk features than was a white borrower possessing similar borrower and underwriting characteristics. The regression analysis further demonstrates that a Hispanic borrower was 2.930 times more likely to receive one of these loans with higher risk features than was a white borrower possessing similar borrower and underwriting characteristics. These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Hispanic and white borrowers.

95.    Data reported by the Bank and available through public databases shows that in 2004-2012, 32.1% of loans made by JPMorgan to African-American and Hispanic customers in Miami were high cost, but only 13.3% of loans made to white customers in Miami were high cost. This data demonstrates a pattern of statistically significant differences in the product placement for high cost loans between minority and white borrowers.

96.    Thus, the disparities are not the result of, or otherwise explained by, legitimate non-racial underwriting criteria.

97.    The following map of JPMorgan predatory loans originated in Miami between 2004-2012 illustrates the geographic distribution of predatory loans in African-American and

27

Hispanic neighborhoods and white neighborhoods in Miami. This map demonstrates that JPMorgan's predatory loans are disproportionately located in minority neighborhoods.



98.    The fact that predatory loans involving all of JPMorgan's loan products are more

010345-11 696160V1

heavily concentrated in minority neighborhoods in Miami is consistent with the practice of reverse redlining and, upon information and belief, has contributed significantly to the disproportionately high rates of foreclosure in minority communities in Miami.

**D.     Miami's Data Analysis is Corroborated by Additional Studies/Reports.**

99.     According to *Discretionary Pricing, Mortgage Discrimination, and the Fair Housing Act*, 45 HARVARD CIVIL RIGHTS-CIVIL LIBERTIES LAW REV. 375, 398 (2010), several studies dating back to 2000 have established that minority borrowers were charged higher interest rates/fees than similar creditworthy white borrowers.

100.    Likewise, according to *A Racial Financial Crisis*, 83 TEMPLE LAW REV. 941, 947, 949 (2011), one study concluded that "even after controlling for underwriting variables, African-American borrowers were 6.1% to 34.3% more likely than whites to receive a higher rate subprime mortgage during the subprime boom." And another study found that significant loan pricing disparity exists among low risk borrowers – African-American borrowers were 65% more likely to receive a subprime home purchase loan than similar creditworthy white borrowers, and 124% more likely to receive a subprime refinance loan.

101.    Similarly, the Center for Responsible Lending's November 2011 Report, *Lost Ground, 2011: Disparities in Mortgage Lending and Foreclosures*, stated that "racial and ethnic differences in foreclosure rates persist even after accounting for differences in borrower incomes." Further, the Center stated it is "particularly troublesome" that minorities received riskier loans "even within [similar] credit ranges." For example, among borrowers having FICO scores above 660, the incidence of higher rate loans among various groups was as follows: whites – 6.2%; African-American – 21.4% (3.5 times white rate); and Hispanic – 19.3% (3.1 times white rate).

**E.     JPMorgan's Targeting of Minorities who in Fact Receive Predatory Loan Terms Regardless of Creditworthiness Causes Foreclosures.**

**1.     Data shows that JPMorgan's foreclosures are disproportionately located in minority neighborhoods in Miami.**

102.    JPMorgan has intentionally targeted predatory practices at African-American and Hispanic neighborhoods and residents. Far from being a responsible provider of much-needed credit in minority communities, JPMorgan is a leading cause of stagnation and decline in African-American and Hispanic neighborhoods where its foreclosures are concentrated.

30

Specifically, since at least 2000, its foreclosures have been concentrated in neighborhoods with African-American or Hispanic populations exceeding 75%.

103.    Although 55.6% of JPMorgan's loan originations in Miami from 2004 to 2012 were in census tracts that are at least 75% African-American or Hispanic, 60.7% of loan originations that had entered foreclosure by June 2013 were in those census tracts. Similarly, while 84.2% of JPMorgan's loan originations in Miami from 2004 to 2012 occurred in census tracts that are at least 50% African-American or Hispanic, 95.5% of JPMorgan's loan originations that ha d entered foreclosure by June 2013 were in those census tracts. Moreover, while 15.8% of JPMorgan's loan originations in Miami from 2004 to 2012 occurred in census tracts that were less than 50% African-American or Hispanic, only 4.5% of JPMorgan's loan originations that had entered foreclosure by June 2013 were in those census tracts. This data demonstrates a pattern of statistically significant differences between African-American and white borrowers and between Hispanic and white borrowers.

104.    The following map represents the concentration of JPMorgan's loan originations from 2004 through 2012 that had entered foreclosure by June 2013 in African-American and Hispanic neighborhoods. In addition to the disproportionate distribution of JPMorgan foreclosures in African-American and Hispanic neighborhoods, disparate rates of foreclosure based on race further demonstrate JPMorgan's failure to follow responsible underwriting practices in minority neighborhoods. While 32.2% of JPMorgan's loans in predominantly (greater than 90%) African-American or Hispanic neighborhoods result in foreclosure, the same is true for only 9.3% of its loans in non-minority (at least 50%) neighborhoods. In other words, a JPMorgan loan in a predominantly African-American or Hispanic neighborhood is 4.629 times more likely to result in foreclosure as is a JPMorgan loan in a non-minority neighborhood. These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Hispanic and white borrowers.

31



% of Occupied Housing Units that are African-American or Hispanic, 2010

- 90.1% - 100%
- 75.1% - 90%
- 50.1% - 75%
- 50%   or Less
- No Occupied Housing Units

JPMorgan Chase 2004-2012 Loan Originations that had Entered Foreclosure as of June 2013
• 1 Dot = 1 Property

32

105.    Thus, JPMorgan's discretionary lending policies and pattern or practice of targeting of minorities, who in fact receive predatory loan terms regardless of creditworthiness, have caused and continue to cause foreclosures in Miami.

### 2.    Data shows that JPMorgan's loans to minorities result in especially quick foreclosures in Miami.

106.    A comparison of the time from origination to foreclosure of JPMorgan's loans originated in Miami shows a marked disparity with respect to the speed with which loans to African-Americans and Hispanics and whites move into foreclosure. The average time to foreclosure for African-American borrowers is 2.627 years, and for Hispanic borrowers is 2.714 years. By comparison, the average time to foreclosure for white borrowers is 3.037 years. These statistically significant disparities demonstrate that JPMorgan aggressively moved minority borrowers into foreclosure as compared with how the Bank handled foreclosures for white borrowers.

107.    This disparity in time to foreclosure is further evidence that JPMorgan is engaged in lending practices consistent with reverse redlining. The disparity in time to foreclosure demonstrates that JPMorgan is engaged in irresponsible underwriting in African-American and Hispanic communities that does not serve the best interests of borrowers. If JPMorgan were applying the same underwriting practices in African-American and Hispanic neighborhoods and white neighborhoods in Miami, there would not be a significant difference in time to foreclosure. Were JPMorgan underwriting borrowers in both communities with equal care and attention to proper underwriting practices, borrowers in African-American and Hispanic communities would not find themselves in financial straits significantly sooner during the lives of their loans than borrowers in white communities. The faster time to foreclosure in African-American and Hispanic neighborhoods is consistent with underwriting practices in minority communities that are less concerned with determining a borrower's ability to pay and qualifications for the loan than they are in maximizing short-term profit.

108.    The HUD/Treasury Report confirms that time to foreclosure is an important indicator of predatory practices: "[t]he speed with which the subprime loans in these

33

communities have gone to foreclosure suggests that some lenders may be making mortgage loans to borrowers who did not have the ability to repay those loans at the time of origination."[32]

> **3.** **Data shows that the discriminatory loan terms cause the foreclosures in Miami.**

109.     JPMorgan's discriminatory lending practices cause foreclosures and vacancies in minority communities in Miami.

110.     Steering borrowers into loans that are less advantageous than loans for which they qualify, including steering borrowers who qualify for prime loans into subprime loans, can cause foreclosures because the borrowers are required to make higher loan payments. The difference between what a borrower who is steered in this manner must pay and the lower amount for which the borrower qualified can cause the borrower to be unable to make payments on the mortgage. In such instances, the borrower would have continued to make payments on the mortgage and remained in possession of the premises had JPMorgan made the loan without improperly steering the borrower into a subprime, or less advantageous loan. Steering borrowers in this manner, therefore, causes foreclosures and vacancies.

111.     Giving a loan to an applicant who does not qualify for the loan, especially a refinance or home equity loan, can also cause foreclosures and vacancies. Some homeowners live in properties that they own subject to no mortgage. Other homeowners live in properties with modest mortgages that they can comfortably afford to pay. Where a lender, such as JPMorgan, solicits such a homeowner to take out a home equity loan on his or her property, or alternatively, to refinance his or her existing loan into a larger loan without proper underwriting to assure that the borrower can make the monthly payments for the new, larger loan, the result is likely to be that the borrower will be unable to make payments on the mortgage. This is particularly true where the borrower is refinanced from a fixed-rate loan into an adjustable rate loan that the lender knows the borrower cannot afford should interest rates rise. In some instances, the lender may refinance the borrower into a new loan that the lender knows the borrower cannot sustain, given the borrower's present debt obligations and financial resources. In such circumstances, the likely result of such practices is to cause homeowners who are otherwise occupying properties without a mortgage, or comfortably making payments on a

---

[32] HUD/Treasury Report, at 25.

modest existing mortgage, to be unable to make payment on a new, unaffordable loan. This, in turn, causes foreclosures and vacancies. If these unaffordable refinance and home equity loans had not been made, the subject properties would not have become vacant.

112.    A regression analysis of loans issued by JPMorgan in Miami from 2004-2012, controlling for objective risk characteristics such as credit history, loan to value ratio, and the ratio of loan amount to income demonstrates that a predatory loan is 2.772 times more likely to result in foreclosure than is a non-predatory loan.

113.    The regression analysis also demonstrates that a predatory loan made to an African-American borrower was 2.115 times more likely to result in foreclosure as was a non-predatory loan made to a white borrower with similar borrower and underwriting characteristics. A predatory loan made to a Hispanic borrower was 3.488 times as likely to result in foreclosure as was a non-predatory loan made to a white borrower with similar risk characteristics. These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers, and between Hispanic and white borrowers.

114.    A regression analysis of loans with higher risk factors including government loans (FHA/VA) and other high cost loans issued by JPMorgan in Miami from 2008-2012, controlling for borrower race and objective risk characteristics such as ratio of loan amount to income, demonstrates that these loans are 2.962 times more likely as loans without these higher risk features to result in foreclosure. These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Hispanic and white borrowers.

## VI.    INJURY TO MIAMI CAUSED BY JPMORGAN'S DISCRIMINATORY LOAN PRACTICES

115.    Miami has suffered both non-economic and economic injuries as a direct result of JPMorgan's pattern or practice of reverse redlining and the resulting disproportionately high rate of foreclosure on JPMorgan loans to African-Americans and Hispanics in minority neighborhoods in Miami. Miami seeks redress for these injuries. The City does not seek redress in this action for injuries resulting from foreclosures on mortgages originated by lenders other than JPMorgan.

116.    JPMorgan continues to engage in the discriminatory pattern or practice described herein with similar and continuing deleterious consequences to the City.

35

117.    Through the use of expert evidence and analytic tools such as Hedonic regression, Miami is capable of establishing that the Bank's discriminatory lending practices were the cause of the resulting injuries alleged herein in a manner that excludes other potential causes.

### A.    Non-Economic Injuries

118.    JPMorgan's conduct has adversely impacted the racial composition of the City and impaired the City's goals to assure racial integration and desegregation and the social and professional benefits of living in an integrated society.

119.    The Bank's predatory lending conduct frustrates the City's longstanding and active interest in promoting fair housing and securing the benefits of an integrated community, which is the purpose and mission of the Miami's Department of Community & Economic Development. The Department, which has responsibility for operating the City's fair housing program, is designed to "affirmatively further fair housing objectives of Title VI of the Civil Rights Act of 1964, Title VIII of the Civil Rights Act of 1968, as amended, and other relevant federal, state, and local housing laws." In discharging that responsibility, the Department "actively works to reduce illegal housing discrimination. The City promotes equal housing opportunity through education and training, monitoring and investigating fair housing complaints utilizing techniques to support fair housing litigation, and conducts research and studies to identify and address fair housing impediments." [33] The Bank's discriminatory lending practices directly interferes with the City's ability to achieve these important objectives.

### B.    Economic Injuries

120.    The City has suffered economic injury based upon reduced property tax revenues resulting from (a) the decreased value of the vacant properties themselves, and (b) the decreased value of properties surrounding the vacant properties. In addition, the City has suffered economic injury resulting from the cost of municipal services that it provided and still must provide to remedy blight and unsafe and dangerous conditions which exist at properties that were foreclosed as a result of JPMorgan's illegal lending practices.

---

[33] http://www.miamigov.com/communitydevelopment/pages/housing/FairHousing.asp.

1.      **Miami has been injured by a reduction in property tax revenues from foreclosures caused by discriminatory loans issued by JPMorgan.**

121.    When a home falls into foreclosure, it affects the property value of the foreclosed home as well as the values of other homes in the neighborhood. These decreased property values in turn reduce property tax revenues to the City.

122.    As property values drop, Miami communities could lose millions in property tax revenues from the decreased value of the foreclosed homes themselves and those in the surrounding neighborhoods.

123.    To be clear, vacancies and short sales even prior to completion of foreclosure also result in diminished home values. Indeed, "[i]n 12 states, including California, Florida, Arizona, New York and New Jersey, pre-foreclosure sales actually outnumbered REO sales."[34] Such distressed sales reduce property values.[35]

124.    Homes in foreclosure tend to experience a substantial decline in value relative to those not in foreclosure (e.g., 28%).[36] The relative decline in property values can be measured by a number of objective criteria, including the well-established Case-Shiller Home Price Index for the Miami Metropolitan Statistical Area.

125.    A portion of this lost home value is attributable to homes foreclosed as a result of JPMorgan's discriminatory loan practices.

126.    The decreased property values of foreclosed homes in turn reduce property tax revenues to the City and constitute damages suffered by Miami.

127.    JPMorgan foreclosure properties and the problems associated with them likewise cause especially significant declines in surrounding property values because the neighborhoods become less desirable. This in turn reduces the property tax revenues collected by Miami.

---

[34]     *See*   http://www.realtytrac.com/content/news-and-opinion/short-sales-increasing-in-2012--short-sale-process----realtytrac.7204.

[35]  *See*  http://www.realtytrac.com/content/foreclosure-market-report/us-foreclosure-sales-and-short-sales-report-q1-2013-7732.

[36]  John Y. Campbell, Stefano Giglio, and Parag Pathak, National Bureau of Economic Research, NBER Working Paper Series, *Forced Sales and House Prices* (2009), *available at* http://www.nber.org/papers/w14866.pdf?new_window=1.

128.    Property tax losses suffered by Miami as a result of JPMorgan's foreclosures are fully capable of empirical quantification.

129.    Routinely maintained property tax and other data allow for the precise calculation of the property tax revenues lost by the City as a direct result of particular JPMorgan foreclosures. Using a well-established statistical regression technique that focuses on effects on neighboring properties, the City can isolate the lost property value attributable to JPMorgan foreclosures from losses attributable to other causes, such as neighborhood conditions. This technique, known as Hedonic regression, when applied to housing markets, isolates the factors that contribute to the value of a property by studying thousands of housing transactions. Those factors include the size of a home, the number of bedrooms and bathrooms, whether the neighborhood is safe, whether neighboring properties are well-maintained, and more. Hedonic analysis determines the contribution of each of these house and neighborhood characteristics to the value of a home.

130.    The number of foreclosures in a neighborhood is one of the neighborhood traits that Hedonic analysis can examine. Hedonic analysis allows for the calculation of the impact on a property's value of the first foreclosure in close proximity (*e.g.*, ⅛ or ¼ of a mile), the average impact of subsequent foreclosures, and the impact of the last foreclosure.

131.    Foreclosures attributable to JPMorgan in minority neighborhoods in Miami can be analyzed through Hedonic regression to calculate the resulting loss in the property values of nearby homes. This loss can be distinguished from any loss attributable to non-JPMorgan foreclosures or other causes. The loss in property value in minority neighborhoods in Miami attributable to JPMorgan's unlawful acts and consequent foreclosures can be used to calculate the City's corresponding loss in property tax revenues.

132.    Various studies establish that Hedonic regression can be used for this purpose. A study published by the Fannie Mae Foundation, using Chicago as an example, determined that each foreclosure is responsible for an average decline of approximately 1.1% in the value of each single-family home within an eighth of a mile.[37]

---

[37] *See* Dan Immergluck & Geoff Smith, *The External Costs of Foreclosure: The Impact of Single-Family Mortgage Foreclosures on Property Values*, 17 HOUSING POLICY DEBATE 57, 69 (2006).

133.    Other studies have focused on the impact of abandoned homes on surrounding property values. A study in Philadelphia, for example, found that each home within 150 feet of an abandoned home declined in value by an average of $7,627; homes within 150 to 299 feet declined in value by $6,810; and homes within 300 to 449 feet declined in value by $3,542.[38]

134.    These studies highlight the foreseeability of tax related harm to the City as the result of foreclosures arising from discriminatory loans.

135.    And most recently, a study in Los Angeles reported, "[i]t is conservatively estimated that each foreclosed property will cause the value of neighboring homes within an eighth of a mile to drop 0.9%." Thus, "[i]n Los Angeles, impacted homeowners could experience property devaluation of $53 billion."[39] This decreased property value of neighboring homes in turn reduces property tax revenues to the City.

136.    Application of such Hedonic regression methodology to data regularly maintained by Miami can be used to quantify precisely the property tax injury to the City caused by JPMorgan's discriminatory lending practices and resulting foreclosures in minority neighborhoods.

**C.      Miami Is Injured Because It Has Provided and Still Must Provide Costly Municipal Services for Foreclosure Properties in Minority Neighborhoods as a Direct Result of Discriminatory Loans Originated or Purchased by JPMorgan.**

137.    Vacant JPMorgan foreclosure properties cause direct costs to the City because the City is required to provide increased municipal services at these properties. Even prior to completion of the foreclosure process, data shows that 20% of homes are vacated.[40] These increased municipal services would not have been necessary if the properties had not been foreclosed upon.

---

[38] *See* Anne B. Shlay & Gordon Whitman, *Research for Democracy: Linking Community Organizing and Research to Leverage Blight Policy*, at 21 (2004).

[39] The Alliance of Californians for Community Empowerment and the California Reinvestment Coalition, *The Wall Street Wrecking Ball: What Foreclosures are Costing Los Angeles Neighborhoods*, at 3 ("Cost to Los Angeles Report").

[40] *See* http://www.realtytrac.com/content/foreclsoure-market-report/owner-vacated-foreclosure-update-7771.

138.    For example, the City's Police Department has sent, and will continue to send, personnel and police vehicles to JPMorgan foreclosure properties to respond to a variety of problems, including increased vagrancy, criminal activity, and threats to public health and safety that arise at these properties because of their foreclosure status. Because violent crime has generally been found to increase due to foreclosures, the Miami PD must respond to calls reporting suspicious activity at foreclosure properties and perform ongoing investigations involving criminal activity, including gang activity, at these properties.

139.    Likewise, the Miami Fire Department has sent, and will continue to send personnel and resources to JPMorgan foreclosure properties to respond to a variety of fire-related problems that arise at these properties because of their foreclosure status.

140.    The Miami Building Department and Code Enforcement/Code Compliance Departments have devoted, and will continue to devote personnel time and out-of-pocket funds to perform a number of tasks that arise at these properties because of their foreclosure status. These include, but are not limited to the following: (a) inspect and issue permitting violations in contravention of Florida statutes 553 and the Florida Building Code; (b) inspect and issue violations of the Miami City Code and Florida statutes 162; (c) condemn and demolish vacant structures deemed an imminent hazard to public safety.

141.    The City frequently hires independent contractors to perform certain services, including, but not limited to, (i) removing excess vegetation at vacant properties, (ii) hauling away trash and debris at vacant properties, (iii) boarding vacant property from casual entry, (iv) putting up fencing to secure vacant properties, (v) painting and removing graffiti at vacant properties. Occasionally, some of these services are performed by the City's General Services Administration Department.

142.    The Miami City Attorney's Office has devoted, and will continue to devote personnel time and out-of-pocket resources perform a number of tasks that arise at these properties because of their foreclosure status. These include, but are not limited to the following: (a) prosecuting code enforcement cases; (b) preserving the City's lien rights at judicial foreclosure proceedings; and (c) pursuing court ordered injunctions involving a myriad of potential problems at foreclosure properties.

143.    The City is required to administer and fund the Unsafe Structures Board, which was formerly under the jurisdiction of Miami-Dade County.

40

144.    As described in the *Cost to Los Angeles Report*, "[l]ocal government agencies have to spend money and staff time on blighted foreclosed properties, providing maintenance, inspections, trash removal, increased public safety calls, and other code enforcement services …. Responding to these needs is a gargantuan task that involves multiple agencies and multiple levels of local government."[41]

145.    Moreover, as discussed above, the Apgar-Duda report underscores the foreseeability of municipal costs as the result of foreclosures arising from discriminatory loans.

## VII.    SAMPLE PROPERTIES IN THE CITY OF MIAMI.

### A.    Foreclosures

146.    Plaintiff has preliminarily identified two thousand three hundred and eighty-three (2,383) discriminatory loans issued by JPMorgan in Miami between 2004-2012 that resulted in commencement of foreclosure proceedings.[42] The City has already incurred, or will incur in the future, damages corresponding to each of these properties. A sample of property addresses corresponding to these foreclosures is set forth below:[43]

> 3770 Oak Ave., 33133
>
> 4010 NW 11th St., 33126
>
> 801 NW 47th Ave. Unit 202W, 33126
>
> 4707 NW 7th St., Unit 104-8, 33126
>
> 1878 NW 15th Ave., Unit 4

### B.    Predatory Loans Issued Subsequent to June 13, 2012.

147.    JPMorgan has continued to issue discriminatory loans in Miami subsequent to June 13, 2012. A sample of property addresses corresponding to the issuance of these loans is set

---

[41] *Id.*

[42] Plaintiff anticipates that it will be able to identify more foreclosures resulting from the issuance of discriminatory loans during this time period with the benefit of discovery. This conclusion derives from the fact that, because of certain reporting limitations, the publicly available mortgage loan databases utilized by Plaintiff are not as comprehensive as the mortgage loan databases maintained by and in the possession of an issuing bank.

[43]    Each of the sample loans was originated by JPMorgan during 2008.

41

forth below. Based upon the analysis performed by the City's experts in this case to date, coupled with their analysis in previous predatory lending cases, the experts are aware that a percentage of these predatory loans originated subsequent to June 13, 2012 will eventually enter the foreclosure process, thereby damaging the City.

451 NW 52nd Ave., 33126

2734 SW 30th Ave., 33133

4540 NW 4th St., 33126

1435 SW 19th Ave., 33145

1291 NW 57th St., 33142

## VIII.   STATUTE OF LIMITATIONS AND CONTINUING VIOLATIONS DOCTRINE.

148.     As alleged herein, Defendant JPMorgan has engaged in a continuous pattern and practice of mortgage discrimination in Miami since at least 2004 by imposing different terms or conditions on a discriminatory and legally prohibited basis. In order to maximize profits at the expense of the City of Miami and minority borrowers, JPMorgan adapted its unlawful discrimination to changing market conditions and originated predatory mortgages in accordance with the various specific practices referenced herein. This unlawful pattern and practice of discriminatory conduct is continuing through the present and has not terminated. Therefore, the operative statute of limitations governing actions brought pursuant to the Federal Fair Housing Act has not commenced to run.

## IX.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(Violation of the Federal Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*)**

149.     Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

150.     The Fair Housing Act's stated purpose is to provide, "within constitutional limitations, for fair housing throughout the United States."

151.     In contravention of that purpose, JPMorgan's acts, policies, and practices as described constitute intentional lending discrimination on the basis of race. JPMorgan has

intentionally targeted residents of predominantly African-American and Hispanic neighborhoods in Miami for different treatment than residents of predominantly white neighborhoods in Miami with respect to mortgage lending. JPMorgan has intentionally targeted residents of these neighborhoods for high-cost loans without regard to their credit qualifications and without regard to whether they qualify for more advantageous loans, including prime loans. JPMorgan has intentionally targeted residents of these neighborhoods for increased interest rates, points, and fees, and for other disadvantageous loan terms including, but not limited to, adjustable rates, prepayment penalties, and balloon payments. JPMorgan has intentionally targeted residents of these neighborhoods for unfair and deceptive lending practices in connection with marketing and underwriting mortgage loans.

152.   JPMorgan's acts, policies, and practices have had an adverse and disproportionate impact on African-Americans and Hispanics and residents of predominantly African-American and Hispanic neighborhoods in Miami as compared to similarly situated whites and residents of predominantly white neighborhoods in Miami. This adverse and disproportionate impact is the direct result of JPMorgan's policies of providing discretion to loan officers and others responsible for mortgage lending; failing to monitor this discretion to ensure that borrowers were being placed in loan products on a nondiscriminatory basis when JPMorgan had notice of widespread product placement disparities based on race and national origin; giving loan officers and others responsible for mortgage lending large financial incentives to issue loans to African-Americans and Hispanics that are costlier than better loans for which they qualify; otherwise encouraging and directing loan officers and others responsible for mortgage lending to steer borrowers into high-cost loans or loans with adjustable rates, prepayment penalties, or balloon payments without regard for whether they qualify for better loans; and setting interest rate caps. These policies have caused African-Americans and Hispanics and residents of predominantly African-American and Hispanic neighborhoods in Miami to receive mortgage loans from JPMorgan that have materially less favorable terms than mortgage loans given by JPMorgan to similarly situated whites and residents of predominantly white neighborhoods in Miami, and that are materially more likely to result in foreclosure.

153.   JPMorgan's residential lending-related acts, policies, and practices constitute reverse redlining and violate the Fair Housing Act as:

(a)     Discrimination on the basis of race and national origin in making available, or in the terms and conditions of, residential real estate-related transactions, in violation of 42 U.S.C. § 3605(a); and

(b)     Discrimination on the basis of race and national origin in the terms, conditions, or privileges of sale of a dwelling, in violation of 42 U.S.C. § 3604(b).

154.    JPMorgan's policies or practices are not justified by business necessity or legitimate business interests.

155.    JPMorgan's policies and practices are continuing.

156.    The City is an "aggrieved person" as defined by 42 U.S.C. § 3602(i) and has suffered damages as a result of JPMorgan's conduct.

157.    The City's damages include lost tax revenues and the need to provide increased municipal services. The loss of tax revenues at specific foreclosure sites and at closely neighboring properties in predominantly minority neighborhoods of the City was a foreseeable consequence that was fairly traceable to JPMorgan's discriminatory lending. Likewise, the need to provide increased municipal services at blighted foreclosure sites in predominantly minority neighborhoods of the City was a foreseeable consequence that was fairly traceable to JPMorgan's discriminatory lending.

158.    JPMorgan's policies and practices, as described herein, had the purpose and effect of discriminating on the basis of race or national origin. These policies and practices were intentional, willful, or implemented with reckless disregard for the rights of African-American and Hispanic borrowers.

159.    The City has substantial interest in preventing discriminatory lending that causes disproportionately minority home foreclosures within its boundaries, in preventing segregated areas where minority loans are more likely to foreclose, and in holding banks accountable for damages arising from that discriminatory lending. Accordingly, the City's interests in obtaining injunctive relief to prevent such discrimination and in remedying the blight and recovering the lost property taxes resulting from the disproportionately minority home foreclosures in Miami are directly related to ensuring "fair housing throughout the United States."

**SECOND CLAIM FOR RELIEF**

**(Common Law Claim For Unjust Enrichment Based On Florida Law)**

010345-11 696160V1

160.    Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

161.    Defendants have received and utilized benefits derived from a variety of municipal services, including police and fire protection, as well as zoning ordinances, tax laws, and other laws and services that have enabled Defendants to operate and profit within the City of Miami while engaging in a lengthy pattern and practice of unlawful activity. Defendants are not legally entitled to the benefits of these services to the extent they were utilized to further the unlawful conduct alleged herein.

162.    Defendants are aware of and have taken advantage of the services and laws provided by the City of Miami to further their unlawful businesses practices.

163.    As a direct and proximate result of Defendants' predatory lending practices, Defendants have been enriched at the City's expense by utilizing benefits conferred by the City and, rather than engaging in lawful lending practices, Defendants have engaged in unlawful lending practices that have both denied the City revenues it had properly expected through property and other tax payments and by costing the City additional monies for services it would not have had to provide in the neighborhoods affected by foreclosures due to predatory lending, absent the Defendants' unlawful activities. Additionally, by foreclosing on the properties for which JPMorgan issued predatory loans, the City expended otherwise unnecessary externalities to protect the properties acquired by Defendants in foreclosure, including, at a minimum, increased police protection. Defendants were specially benefitted as the new owners of these properties. Defendants have failed to remit those wrongfully obtained benefits or reimburse the City for its costs improperly caused by Defendants, and retention of the benefits by Defendants would be unjust without payment.

164.    In addition, to its detriment the City has paid for the Defendants' externalities, or Defendants' costs of harm caused by its mortgage lending discrimination, in circumstances where Defendants are and have been aware of this obvious benefit and retention of such benefit would be unjust.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), the City demands a trial by jury on all issues so triable.

010345-11 696160V1

## PRAYER FOR RELIEF

WHEREFORE, the City respectfully prays that the Court grant it the following relief:

A.      Enter a declaratory judgment that the foregoing acts, policies, and practices of JPMorgan violate 42 U.S.C. §§ 3604 and 3605;

B.      Enter a permanent injunction enjoining JPMorgan and its directors, officers, agents, and employees from continuing the discriminatory conduct described herein, and directing JPMorgan and its directors, officers, agents, and employees to take all affirmative steps necessary to remedy the effects of the discriminatory conduct described herein, and to prevent additional instances of such conduct or similar conduct from occurring in the future, pursuant to 42 U.S.C. § 3613(c)(1);

C.      Award compensatory damages to the City in an amount to be determined by the jury that would fully compensate the City of Miami for its injuries caused by the conduct of JPMorgan alleged herein, pursuant to 42 U.S.C. § 3613(c)(1);

D.      Award punitive damages to the City in an amount to be determined by the jury that would punish JPMorgan for the willful, wanton, and reckless conduct alleged herein, and that would effectively deter similar conduct in the future, pursuant to 42 U.S.C. § 3613(c)(1);

E.      Award the City its reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 3613(c)(2);

F.      Require payment of pre-judgment interest on monetary damages; and

G.      Order such other relief as this Court deems just and equitable.

010345-11 696160V1

Date: August 11, 2014                     Respectfully submitted,

                                          By: /s/ Lance A. Harke
                                          Lance A. Harke, P.A.
                                          Florida Bar No. 863599
                                          HARKE CLASBY & BUSHMAN, LLP
                                          9699 N.E. Second Avenue
                                          Miami, FL 33138
                                          Telephone: (305) 536-8220
                                          lharke@harkeclasby.com

                                          Victoria Méndez
                                          Florida Bar No. 194931
                                          CITY OF MIAMI
                                          OFFICE OF THE CITY ATTORNEY
                                          444 S.W. 2nd Avenue, Suite 945
                                          Miami, FL 33130
                                          Telephone: (305) 416-1800
                                          vmendez@miamigov.com

                                          Steve W. Berman (*pro hac vice*)
                                          HAGENS BERMAN SOBOL SHAPIRO, LLP
                                          1918 Eighth Avenue, Suite 3300
                                          Seattle, WA 98101
                                          Telephone: (206) 623-7292
                                          steve@hbsslaw.com

                                          Elaine T. Byszewski (*pro hac vice*)
                                          Lee M. Gordon (*pro hac vice*)
                                          HAGENS BERMAN SOBOL SHAPIRO, LLP
                                          301 North Lake Avenue, Suite 203
                                          Pasadena, CA 91101
                                          Telephone: (213) 330-7150
                                          elaine@hbsslaw.com
                                          lee@hbsslaw.com

                                          Erwin Chemerinsky (*pro hac vice pending*)
                                          UNIVERSITY OF CALIFORNIA, IRVINE
                                          401 East Peltason Drive, Educ. 1095
                                          Irvine, CA 92697
                                          Telephone: (949) 824-7722
                                          echemerinsky@law.uci.edu

                                          Joel Liberson (*pro hac vice*)
                                          Howard Liberson (*pro hac vice*)
                                          TRIAL & APPELLATE RESOURCES, P.C.
                                          400 Continental Blvd., 6th Floor
                                          El Segundo, CA 90245
                                          Telephone: (310) 426-2361
                                          joel@taresources.com
                                          howard@taresources.com

Robert S. Peck (*pro hac vice pending*)
CENTER FOR CONSTITUTIONAL
LITIGATION, P.C.
777 6th Street N.W., Suite 520
Washington, DC 20001
Telephone: (202) 944-2803
robert.peck@cclfirm.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed on August 11,

2014 with the Clerk by using the CM/ECF system, which will send notification of such filing to

all attorneys of record.

/s/ Lance A. Harke

48